## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

---

KATRINA TARZIAN and SENIA HARDWICK,
*on behalf of themselves and others similarly situated,*

Plaintiffs,

Case No.

**CLASS ACTION COMPLAINT**

v.

**JURY TRIAL DEMANDED**

KRAFT HEINZ FOOD COMPANY

Defendant.

---

Plaintiff KATRINA TARZIAN (herein "Plaintiff TARZIAN") and SENIA HARDWICK (herein "Plaintiff HARDWICK") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, pursuant to this Class Action Complaint against the Defendant, KRAFT HEINZ FOOD COMPANY ("Defendant" or "Kraft Heinz"), allege the following:

### NATURE OF THE ACTION

1.     This is a consumer protection action seeking redress for, and a stop to, Defendant's unfair and deceptive practice of advertising and marketing its Capri Sun beverages as being free of preservatives by representing that they contain "No Artificial Coloring, Flavors, or Preservatives." Below is an example:



2.     Defendant's representation that its Capri Sun beverages are free of preservatives is false and deceptive because these contain citric acid, a well-known preservative. This labeling deceives consumers into believing that they are receiving healthier preservative-free beverages when Defendant's products cannot live up to these claims.

3.     Conscious of consumers' increased interest in more nutritious beverages free of additives and willingness to pay more for products perceived to meet this preference, Defendant misleadingly, illegally, and deceptively seeks to capitalize on these consumer health trends.

4.     Defendant sold and continues to sell beverages with deceptive or misleading labeling. The products encompassed by this action are:

1. *Capri Sun* Tropical Punch. **Exhibit A**, pg. 1
2. *Capri Sun* Grape. **Exhibit A**, pg. 2
3. *Capri Sun* Strawberry Kiwi. **Exhibit A**, pg. 3
4. *Capri Sun* Fruit Punch. **Exhibit A**, pg. 4
5. *Capri Sun* Orange. **Exhibit A**, pg. 5
6. *Capri Sun* Strawberry. **Exhibit A**, pg. 6
7. *Capri Sun* Wild Cherry. **Exhibit A**, pg. 7
8. *Capri Sun* Lemonade. **Exhibit A**, pg. 8

2

9. *Capri Sun* Red Berry. **Exhibit A**, pg. 9
10. *Capri Sun* Surfer Cooler. **Exhibit A**, pg. 10
11. *Capri Sun* Pacific Cooler. **Exhibit A**, pgs. 11-12
12. *Capri Sun* Mountain Cooler. **Exhibit A**, pg. 13
13. *Capri Sun* Splash Cooler. **Exhibit A**, pg. 14
14. *Capri Sun* Coastal Cooler. **Exhibit A**, pg. 15
15. *Capri Sun* Organic Fruit Punch. **Exhibit A**, pg. 16
16. *Capri Sun* Organic Apple. **Exhibit A**, pg. 17
17. *Capri Sun* Organic Strawberry Lemonade. **Exhibit A**, pg. 18
18. *Capri Sun* Organic Grape. **Exhibit A**, pg. 19
19. *Capri Sun* Organic Tropical Punch. **Exhibit A**, pg. 20
20. *Capri Sun* 100% Juice: Apple. **Exhibit A**, pg. 21
21. *Capri Sun* 100% Juice: Berry. **Exhibit A**, pg. 22
22. *Capri Sun* 100% Juice: Fruit Punch. **Exhibit A**, pg. 23
23. *Capri Sun* 100% Juice: Grape. **Exhibit A**, pg. 24
24. *Capri Sun* Fruit Refreshers: Awesomely Apple. **Exhibit A**, pg. 25
25. *Capri Sun* Fruit Refreshers: Very Berry Punch. **Exhibit A**, pg. 26
26. *Capri Sun* Fruit Refreshers: Orange Pineapple Tango. **Exhibit A**, pg. 27
27. *Capri Sun* Fruit and Veggie Blends: Apple Sweet Potato Smash. **Exhibit A**, pg. 28
28. *Capri Sun* Fruit and Veggie Blends: Berry Carrot Blast. **Exhibit A**, pg. 29
29. *Capri Sun* Fruit and Veggie Blends: Punch Carrot Craze. **Exhibit A**, pg. 30
30. *Capri Sun* Roarin' Waters: Tropical Fruit. **Exhibit A**, pg. 31
31. *Capri Sun* Roarin' Waters: Berry. **Exhibit A**, pg. 32
32. *Capri Sun* Roarin' Waters: Fruit Punch. **Exhibit A**, pg. 33
33. *Capri Sun* Roarin' Waters: Grape. **Exhibit A**, pg. 34
34. *Capri Sun* Roarin' Waters: Strawberry Kiwi. **Exhibit A**, pg. 35
35. *Capri Sun* Roarin' Waters: Wild Cherry. **Exhibit A**, pg. 36
36. *Capri Sun* Sport: Fruit Frenzy. **Exhibit A**, pg. 37
37. *Capri Sun* Sport: Citrus Rush. **Exhibit A**, pg. 38
38. *Capri Sun* Sport: Grape Blast. **Exhibit A**, pg. 39
39. Any other *Capri Sun* beverage that is represented as preservative-free while containing citric acid and/or any other preservatives (individually, a "Product"; collectively, the "Products," which include all sizes of each beverage)

5.      Plaintiffs bring this proposed consumer class action on behalf of themselves and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Products for consumption and not resale.

6.      Defendant markets the Products in a way that is deceptive to consumers under consumer protection laws of Illinois, New York, the other 48 states, and the District of Columbia.

3

7.     Defendant violates statutes enacted in each of the fifty states and the District of

Columbia that are designed to protect consumers against unfair, deceptive, fraudulent,

unconscionable trade and business practices, and false advertising. These statutes are:

1) Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*
2) Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.;*
3) Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*
4) Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*
5) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*
6) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*
7) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*
8) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*
9) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*
10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*
11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*
12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*
13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*
14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*
15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*
16) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*
17) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*
18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*
19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § § 51:1401, *et seq.;*
20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq,,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*
21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*
22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;
23) Michigan Consumer Protection Act, § § 445.901, *et seq.;*
24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*
25) Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*
26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*
27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*
28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*
29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*
30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq. ;*
31) New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 *1, et seq.;*
32) New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 *1, et seq.;*
33) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*
34) North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*
35) North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*

36) Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*
37) Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*
38) Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*
39) Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*
40) Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*
41) South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*
42) South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*
43) Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*
44) Texas Stat. Ann. §§ 17.41, *et seq.,* Texas Deceptive Trade Practices Act, *et seq.;*
45) Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*
46) Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*
47) Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*
48) Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*
49) West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*
50) Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*
51) Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative Class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

9.    This court has personal jurisdiction over Defendant because the Products are advertised, marketed, distributed, and sold throughout Illinois. Defendant engages in the wrongdoing alleged in this Complaint throughout Illinois. Defendant is authorized to do business in Illinois, and Defendant has sufficient contacts with Illinois and/or otherwise has intentionally availed itself of the markets in Illinois, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant's activity in Illinois is substantial, not isolated, and Illinois is one of Defendant's two principal places of business.

5

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

*Plaintiffs*

11.     Plaintiff TARZIAN is, and at all times relevant hereto has been, a citizen of Illinois and a resident of Cook County. On October 3, 2018, Plaintiff TARZIAN purchased a 10-pouch pack of Capri Sun Fruit Punch for the premium price of $2.22 at a Walmart on Touhy Avenue in Niles, IL.

12.     Plaintiff TARZIAN purchased the Product relying on Defendant's representations on the Product packaging. As a result of Defendant's deceptive conduct as alleged herein, Plaintiff TARZIAN was injured when she paid money for a beverage that did not deliver the qualities it promised and misled her as to its contents. She paid the above sum on the assumption that she was purchasing a preservative-free beverage.  She would not have been willing to pay the sum she paid had she known it was mislabeled. Defendant's preservative-free labeling misled Plaintiff TARZIAN into believing that she was purchasing a preservative-free beverage. Defendant delivered a Product with significantly less value than was warranted by its representations, thereby depriving her of the benefit of her bargain and injuring her in an amount up to the purchase price. Damages can be calculated through expert testimony at trial.

13.     Plaintiff HARDWICK is, and at all times relevant hereto has been, a citizen of New York State and a resident of Queens County. On March 1, 2018, Plaintiff HARDWICK purchased a 10-pouch pack of Capri Sun Fruit Refreshers Awesome Apple for the premium price of $2.99 at a Key Foods supermarket on Skillman Avenue in Woodside, Queens.

14.     Plaintiff HARDWICK purchased the Product relying on Defendant's representations on the Product packaging. As a result of Defendant's deceptive conduct as alleged

herein, Plaintiff HARDWICK was injured when she paid money for a beverage that did not deliver the qualities it promised and misled her as to its contents. She paid the above sum on the assumption that she was purchasing a preservative-free beverage. She would not have been willing to pay the sum she paid had she known it was mislabeled. Defendant's preservative-free labeling misled Plaintiff HARDWICK into believing that she was purchasing a preservative-free beverage. Defendant delivered a Product with significantly less value than was warranted by its representations, thereby depriving her of the benefit of her bargain and injuring her in an amount up to the purchase price. Damages can be calculated through expert testimony at trial.

*Defendant*

15.    Defendant KRAFT HEINZ FOOD COMPANY is a limited liability company organized under the laws of Pennsylvania with its principal places of business at 1PPG Place, Pittsburgh, PA 15222 and 7600 200 E. Randolph St., Chicago, IL 60601. Defendant's registered agent is CT Corporation System, 208 S Lasalle St, Suite 814 Chicago, IL 60604.

16.    Defendant develops, markets Products throughout the United States. The Products are available at numerous retail and online outlets, including Walmart, Key Foods, and Amazon.com.

17.    The advertising for the Products, relied upon by Plaintiffs, is approved by Defendant and its agents, and is disseminated by Defendant and its agents through advertising containing the misrepresentations alleged herein. The advertising for the Products is designed to encourage consumers to purchase the Products, and misleads the reasonable consumer, i.e. Plaintiffs and the Class. Defendant owns, manufacture and distributes the Products and authorizes the unlawful, fraudulent, unfair, misleading and/or deceptive labeling and advertising for the Products.

7

## FACTUAL ALLEGATIONS

**Defendant's "No Preservatives" Representation Is False And Misleading To A Reasonable Consumer**

18.     Defendant misleads consumers into believing that the Products contain no preservatives with its false labeling claims to this effect.  However, the Products actually contain citric acid, whose functions as preservatives have been well-documented.

19.     Additionally, Defendant's "Sport" line of Products contains trisodium citrate and tripotassium citrate, which are also preservatives (the "citrates").

20.     The FDA defines a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."  21 C.F.R. § 101.22(a)(5).

21.     The citric acid and citrates in the Products have precisely this effect.

22.     The MacMillan Dictionary defines "tends" as "to usually do a particular thing," as in "He tends to exaggerate" or "The gym tends to get very busy at around six o'clock."[1]  The scientific evidence and FDA statements cited below establish that citric acid and ascorbic acid both tend to prevent or retard the deterioration of food. This remains the case regardless of the subjective purpose for which this substance is added to the Product.

23.     Citric acid and the citrates do not fall into any of the regulatory exemptions from the definition of a preservative.

24.     The FDA expressly classifies citric acid as a preservative in its <u>Overview of Food Ingredients, Additives, and Colors</u>, on the FDA's website:

---

[1] http://www.macmillandictionary.com/us/dictionary/american/tend

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| **Preservatives** | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, **citric acid**, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm094211.htm.

25.    Citric acid's nature as a preservative is also acknowledged by insiders in the preservative manufacturing and distribution industries. FBC Industries, Inc. a producer and supplier of FCC grade Citric Acid additives, acidulants, buffering agents and preservatives for the food and beverage industry describes citric acid's function: "Citric acid is the most commonly used acidulant in the industry. As a food additive or food grade product, citric acid is used as a flavoring and preservative. The buffering properties of citrates are used to control pH and flavor."[2]

26.    The FDA's Warning Letter to the manufacturer of the Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites" dated October 6, 2010 further confirms that citric acid and ascorbic acid are preservatives:

> "The 'Pineapple Bites' and 'Pineapple Bites with Coconut' products are further misbranded within the meaning of section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservative ascorbic acid and citric acid but their labels fail to declare these preservatives with a description of their functions. 21 CFR 101.22."

*See* **Exhibit B**, FDA Warning Letter dated October 6, 2010 (emphasis added).

---

[2] http://www.fbcindustries.com/Citric_Acid.aspx

27.     As described above in ¶¶ 20, 22, a preservative as defined by the FDA is a substance that "tends" to prevent or retard the deterioration of foods.  Thus, it is not necessary that it function as a preservative in every single instance for it to qualify as a preservative according to the FDA's definition, so long as this is its general tendency.

28.     However, citric acid and the citrates do as a matter of fact function as preservatives in the Products.

29.     This is confirmed by Dr. Marc Meyers, a food scientist with a Ph.D., nearly thirty years, of experience in the field, multiple patents, and published work.  *See* **Exhibit C**, Declaration of Dr. Marc Meyers ("Meyers Decl.") ¶¶ 3-20.

30.     Dr. Meyers observes that citric acids functions as a preservative in a number of ways.

31.     Citric acid is an anti-microbial.  It kills microbes by reducing the pH of products to which it is added.  Meyers Decl. ¶ 23.  It can kill microbes directly by penetrating the cell walls of microorganisms.  Meyers Decl. ¶ 28

32.     Citric acid also serves as a preservative by functioning as a sequestrant, removing compounds and elements from their environment so as to slow the degradation of food and beverages.  Meyers Decl. ¶ 29.

33.     Citric acid's effects include "delaying spoilage from bacteria, mold, fungi, and yeast; delaying changes in color, flavor, texture; and delaying browning and rancidity" over the shelf-life of a food or beverage product.  Meyers Decl. ¶ 26.

34.     Citric acid also functions as an antioxidant by sequestering metal ions (chelation), which prevents food deterioration and retards microbial growth.  Meyers Decl. ¶ 29.

35.     Citric acid serves as a preservative by functioning as an acidity regulator and acidulant.  Meyers Dec. ¶ 22, 27.

36.     Dr. Meyers observes that while citric acid can also be employed to impart taste, a greater quantity of it is required to impart taste than to preserve foods and beverages.  The preservative effects of citric acid may be reduced at lower levels, but it will still be present. Meyers. Decl. ¶¶ 25-26.

37.     Thus, Defendant cannot argue that it includes citric acid in the Products merely to impart added taste, because the quantities required to impart taste are more than sufficient to function as preservatives.  Even if imparting taste is Defendant's primary <u>motivation</u> for including citric acid, this subjective motivation has no bearing on its objective <u>functioning</u>.

38.     Dr. Meyers also observes that citric acid functions as a preservative in <u>the Products</u> <u>specifically</u>.  Dr. Meyers states:

   a. Citric acid functions as a preservative in the Capri Sun beverage products by serving as an acidulant, lowering their pH-level and thereby combatting microorganisms.
   b. Citric acid functions as a preservative in the Capri Sun beverage products by serving as an indirect antioxidant.
   c. Citric acid functions as a preservative in the Capri Sun beverage products by infiltrating and then weakening or killing microorganisms through direct antimicrobial effect. Regardless of whether this is the primary purpose for which it is added to the Capri Sun beverage products, it still functions as a preservative by direct microbial effect, lowering pH levels, and acting as a sequestrant and indirect antioxidant.
   d. Citric acid functions as a preservative in the Capri Sun beverage products through sequestration, which prevents oxidation and impedes microbial growth.
   e. Citric acid serves these functions regardless of whether it is also being used as a flavorant.
   f. The fact that Defendant may also employ other means of preserving the CapriSun beverage products, like a hermetic seal, does not change citric acid's function as a preservative.

Meyers Decl. ¶ 33

**Plaintiffs' Claims Are Consistent With Federal Law**

39.     Defendant's deceptive misrepresentations violate the FDCA, which provides that "[a] food shall be deemed misbranded. If its labeling is false or misleading in any particular." 21 U.S.C. § 343 (a)(1).

40.     Plaintiffs' claims are not preempted by the FDCA because the definition of "preservative" as used herein is consistent with that of the FDA (see above). Moreover, FDA regulations specifically note that claims like "contains no preservatives" are non-nutritive claims that that are not governed by 21 C.F.R. § 101.13. *See* 21 C.F.R. § 101.65(b)(2). Since the FDA has not issued specific standards governing when "no preservative" claims are either true or false, such representations fall outside the ambit of FDA regulations. Accordingly, Plaintiff's claim cannot possibly be preempted. *See Bimont v. Unilever U.S., Inc.*, No. 14-CV-7749 (JPO), 2015 U.S. Dist. LEXIS 119908, at *6 (S.D.N.Y. Sep. 9, 2015) ("preemption does not preclude a state-law claim if the state requirement is outside the scope of the relevant federal requirements").

**Plaintiffs And Class Members Were Injured As A Result Of Defendant's Misrepresentation**

41.     Plaintiffs and Class members were injured when Defendant denied them the full benefit of their bargain. They paid money for Products that they were led to believe were preservative-free but then received Products that were preservative-laden, which have significantly less value. Plaintiffs and Class members were thus deprived of the benefit of their bargains. Plaintiffs and Class members would not have purchased the Products, or would only have been willing to pay less for them, had they known the truth about them. Plaintiffs and Class members were injured in an amount up to the purchase price, the difference between the actual value of the Products and the value of the Products as misrepresented to them by Defendant, to be determined by expert testimony at trial.

42.     By representing that the Products have "No Preservatives" Defendant seeks to capitalize on consumers' preference for healthier foods and drinks with fewer additives, and the association between these products and a wholesome way of life.

43.     American consumers are increasingly seeking out and purchasing foods that they perceive are principally made of ingredients that are healthful and nutritious.[3]

44.     Consumers are willing to pay more for less processed products with no additives because of this association as well as the perceived higher quality, health, and safety benefits associated with preservative-free foods.

45.     The marketing research firm Mintel reports that more and more Americans are concerned with avoiding foods containing preservatives:

> Foods bearing "free-from" claims are increasingly relevant to Americans, as they perceive the products as closely tied to health. New research from Mintel reveals that **84 percent of American free-from consumers buy free-from foods because they are seeking out more natural or less processed foods**. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent).
>
> Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent).[4]

46.     Alternet.org reports on research showing that most Americans are prepared to pay a premium price for healthier options:

> Not only are consumers increasingly seeking out wholesome foods, they are willing to pay a premium for them. According to Nielsen's 2015 Global Health & Wellness Survey that polled over 30,000 people online, 88 percent of Americans are willing to pay more for healthier foods. Global sales of healthy food products are estimated to reach $1 trillion by 2017, according to Euromonitor.

---

[3] Nancy Gagliardi, Consumers Want Healthy Foods—And Will Pay More for Them, FORBES (Feb. 18, 2015, 11:30 AM), http://goo.gl/A7Z5WN (last visited 01/02/2018) (88% of respondents willing to pay more for healthier foods); see INT'L FOOD INFO. COUNCIL FOUND., WHAT'S YOUR HEALTH WORTH?: FOOD & HEALTH SURVEY 2015, at 42 (2015), http://goo.gl/4g5wNb.

[4] http://www.mintel.com/press-centre/food-and-drink/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed

When it comes to what consumers will be seeking out more of over the coming year, it may amount to single word. "Just think of the word no," Seifer said. "No preservatives, no additives, no growth hormones."[5]

47.    *See Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) ("the issue of 'price premium' was relevant because it showed that Plaintiffs paid more than she would have for the good but for the deceptive practices of the defendant-sellers"); *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("[I]n his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Products had he 'known the truth.'...Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive."); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288-89 (S.D.N.Y. 2014) (Plaintiffs claim that, but for Defendant's "unfair and deceptive practices," they—and the putative class—would not have purchased, or paid a price premium for, Smart Balance. Compl. ¶¶ 7, 81. Indeed, Plaintiffs claim that they paid price premiums specifically 'based on Defendant's misrepresentations,' and allege that they deserve damages in the amount of either the purchase prices, or the price premiums that they paid for Smart Balance. Id. ¶ 81. Accordingly, the Court finds that Plaintiffs have adequately alleged injury under GBL § 349...")

**Defendant's Misrepresentations Were Material To, And Would Be Reasonably Relied Upon By, Reasonable Consumers**

48.    Plaintiffs and Class members reasonably relied on Defendant's false and/or misleading representations that the Products were free of preservatives.

---

[5] http://www.alternet.org/food/8-food-trends-watch-2016

14

49.     At the point of sale, Plaintiffs and Class members did not know, and had no reason to know, that the Products were misbranded and misleading as set forth herein, and would not have bought the Products had they known the truth about them.

50.     A representation that a product has no preservatives is material to a reasonable consumer when deciding to purchase it. Plaintiffs did, and a reasonable consumer would, attach importance to whether Defendant's Products were free of preservatives because it is common knowledge that consumers prefer to avoid foods with potentially unhealthy additives (see consumer behavior research above). Defendant would not have included these representations on the Product labels if this was not going to influence consumer behavior.

**Defendant Has An Intent To Mislead**

51.     Defendant knew that its preservative-free claims are misleading.

52.     Upon information and belief, Defendant retains food scientists who can apprise it of the preservative properties of citric acid.

53.     Given the premium that consumers attach to preservative-free foods, discussed above, Defendant has a natural interest in misleading consumers as detailed above, as its deceptions and misleading omissions provide a clear marketing advantage over competitors that do not engage in such deceptive conduct.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities who made retail purchases of Products in the United States during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Nationwide Class").

In the alternative, Plaintiff TARZIAN seeks to represent a Class consisting of:

> All persons or entities who made retail purchases of the Products in Illinois during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Illinois Class").

In the alternative, Plaintiff HARDWICK seeks to represent a Class consisting of:

> All persons or entities who made retail purchases of the Products in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the New York Class").

55.     The proposed Classes exclude current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, any entity in which it has or has had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

56.     Plaintiffs reserve the right to revise Class definitions based on facts learned in the course of litigating this matter.

57.     This action is proper for class treatment under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure. While the exact number and identities of other Class members are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that there are millions of Class members. Thus, the Class members are so numerous that individual joinder of all Class members is impracticable.

58.     Common questions of law and fact arise from Defendant's conduct described herein. Such questions are common to all Class members and predominate over any questions affecting individual Class members. These include:

> a.     whether claiming that the Products are preservative-free when they contain citric acid (and in some cases additional citrates) is false and misleading;

b.   whether Defendant deprived Plaintiffs and Class members of the benefit of their bargains because the Products purchased had less value than what Defendant warranted;

c.   whether Defendant must disgorge any and all profits it has made as a result of its misconduct; and

d.   whether Defendant should be barred from marketing the Products as preservative-free.

59.   Plaintiffs' claims are typical of those of the Class members because Plaintiffs and the other Class members sustained damages arising out of the same wrongful conduct, as detailed herein. Plaintiffs and Class members purchased Defendant's Products and sustained similar injuries arising out of Defendant's conduct in violation of Federal law, Illinois law, New York law, and the laws of the other 48 states and the District of Columbia.   Defendant's unlawful, unfair, and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of the Classes were caused directly by Defendant's unfair and deceptive practices. In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all Class members. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

60.   Plaintiffs will fairly and adequately represent and pursue the interests of the Classes and have retained competent counsel experienced in prosecuting class actions. Plaintiffs understand the nature of their claims herein, have no disqualifying conditions, and will vigorously represent the interests of the Class members. Neither Plaintiffs nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to the interests of the Class members.

61.     Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class members. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for them.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

63.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refuses to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.

64.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

65.     The prosecution of separate actions by individual Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.

18

Additionally, individual actions may be dispositive of the interest of all Class members, although certain Class members are not parties to such actions.

66.     Defendant's conduct is generally applicable to the Classes as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

## COUNT I

**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *et seq.*)**

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection laws of other states and the District of Columbia to the extent the Illinois Consumer Fraud and Deceptive Practices Act does not reach the claims of out-of-state Class members)**

67.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint and further allege as follows:

68.     The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") prohibits as a deceptive act or practice "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2.

69.     815 ILCS 505/2 also provides that this includes "represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have" as described by the Illinois Uniform Deceptive Trade Practices Act. 815 ILCS 510/2.

70.     The Act provides that "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." A court has the discretion to "award actual economic damages or any other relief which the court deems proper." 815 ILCS 505/10a(a). A court may also "grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." 815 ILCS 505/10a(c).

71.     A plaintiff must allege five elements in order to state a claim under the Act: (1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) the damages were proximately caused by the defendant's deception. *Blankenship v. Pushpin Holdings, LLC*, 157 F. Supp. 3d 788, 792 (N.D. Ill. 2016).

72.     Plaintiffs' claims satisfy element 1 of the Act because Defendant engaged in a deceptive act when it represented that the Products were preservative-free even though they contained citric acid.

73.     Plaintiffs' claims satisfy element 2 of the Act because Defendant intended that Plaintiffs and Class members believe that the Product was preservative-free and to purchase it in reliance on this belief.

74.     Plaintiffs' claims satisfy element 3 of the Act because the deception occurred in the context of a commercial transaction.

75.     Plaintiffs' claims satisfy element 4 of the Act because Plaintiffs sustained actual damages when they paid money for a good that was substantially less valuable than was warranted to them. *See Su Yeun Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) ("In the less typical

case of a private ICFA action brought by an individual consumer, actual loss may occur if the seller's deception deprives the plaintiff of 'the benefit of her bargain' by causing her to pay 'more than the actual value of the property.'") (quoting *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1197-98 (Ill. App. Ct. 2008)).

76.     Plaintiffs' claims satisfy element 5 of the Act because Defendant's deception was the proximate cause of their damages.  Plaintiffs would not have purchased the Product had they known it contained preservatives.  Thus, it was only Defendant's representation to the contrary that caused them to purchase the Products and suffer the resultant injury.

77.     Accordingly, Plaintiffs bring this claim under the Act and request: 1) monetary damages in an amount to be determined by expert analysis at trial, 2) punitive damages, 3) restitution for monies wrongfully obtained, 4) disgorgement of ill-gotten revenues, 4) declaratory relief, 5) injunctive relief enjoining Defendant from disseminating that its Products contain no preservatives, 6) reasonable attorneys' fees, and 7) any other relief deemed appropriate by the Court.

78.     While some Class members' injuries transpired outside Illinois, the decision to market the Products as being preservative-free despite the presence of citric acid was made in Illinois.  Further, the profits ensuing from this misrepresentation flowed back to Illinois.  Thus, the claims of Nationwide Class members are within the reach of the Illinois Consumer Fraud and Deceptive Practices Act.  *See Avery v. State Farm Mutual Ins. Co.*, 835 N.E.2d 801, 853 (2005) ("The place of injury or deception is only one of the circumstances that make up a fraudulent transaction and focusing solely on that fact can create questionable results. If, for example, the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only

thing that occurs out-of-state is the injury or deception, it seems to make little sense to say that the fraudulent transaction has occurred outside Illinois.").

## COUNT II

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

#### (brought on behalf of the New York Class)

79.     Plaintiff HARDWICK realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

80.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

81.     Under the NY GBL § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 … claims, it was error. Justifiable reliance by the plaintiffs is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

82.     Any person who has been injured by reason of any violation of the NY GBL § 349 may bring an action in their own name to enjoin such unlawful act or practice, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

83.    The practices employed by Defendant, whereby it advertises, promotes, and markets its Products as free of preservatives is unfair, deceptive, misleading, and in violation of the NY GBL § 349.

84.    Defendant's business act and practices and/or omissions as alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive, and unfair acts or practices in the conduct of any business, trade, or commerce.

85.    Defendant's Practices described throughout this Complaint, were specifically directed to consumers and violate the NY GBL § 349 for, *inter alia*, the following reasons:

a.    Defendant misrepresents or misleadingly advertises that the Products are free of preservatives with an intent to cause Plaintiff and Class members to believe that they are a healthy alternative in comparison to competitors;

b.    Defendant caused Plaintiff HARDWICK and Class members to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

c.    Defendant made material representations and statements of fact to Plaintiff and Class members that resulted in them reasonably believing the represented or suggested state of affairs to be other than what they actually were.

86.    The practices employed by Defendant, whereby Defendant advertises, promotes, and markets its Products as free of preservatives are unfair, deceptive, and misleading and are in violation of NY GBL § 349.

87.     Under the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices is malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

88.     Defendant's actions impact the public interest because Plaintiff was injured in exactly the same way as millions of others purchasing the Products as a result of and Defendant's generalized course of deception.

89.     The foregoing deceptive acts and practices proximately caused Plaintiff HARDWICK and New York Class members to suffer actual damages in the form of, *inter alia*, monies spent to purchase the Products. Plaintiff and Class members are entitled to recover compensatory damages, statutory damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate. Damages can be calculated through expert testimony at trial.

90.     Defendant should be enjoined from labelling the Products as preservative-free pursuant to NY GBL § 349.  Plaintiff HARDWICK, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT III

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (FALSE ADVERTISING LAW)

**(brought on behalf of the New York Class)**

91.     Plaintiff HARDWICK realleges and incorporates by reference the allegations contained in all preceding paragraphs and further allege as follows:

24

92.     Plaintiff HARDWICK brings this claim individually, as well as on behalf of members of the New York Class, for violations of NY GBL § 350.

93.     Alternatively, should the Court not certify the proposed Nationwide Class, Plaintiff HARDWICK brings this claim individually and on behalf of the members of the New York Class for violations of NY GBL § 350.

94.     Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

95.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

96.     Defendant caused to be disseminated throughout New York and the United States, through advertising, marketing and other publications, statements that were untrue and/or misleading.

97.     Defendant's affirmative misrepresentations that the Products are preservative-free are material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Products were, and continue to be, exposed to Defendant's material deceptions.

98.     Defendant has violated N.Y. Gen. Bus. Law § 350 because its preservative-free representations were material to and likely to deceive a reasonable consumer.

99.     Plaintiff HARDWICK and Class members have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising.

100.    Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiffs and Class members seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a(1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

### COUNT IV

### COMMON LAW FRAUD

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent Illinois common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the Illinois and New York Classes under each state's respective laws)**

101.    Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further alleges as follows:

102.    Defendant intentionally makes materially false and misleading representations regarding the nature of the Products.

103.    Plaintiffs and Class members reasonably relied on Defendant's false and misleading representations. They did not know, and had no reason to know, that the Products contain preservatives.  They would not have purchased the Products had they known Defendant's preservative-free claims were false.

104.    Defendant knew and intended that Plaintiffs and Class members would rely on its misrepresentations.

105.    Plaintiffs and Class members have been injured as a result of Defendant's fraudulent conduct.

106.    Defendant is liable to Plaintiff and Class members for damages sustained as a result of Defendant's fraud.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated, seek judgment against Defendant, as follows:

a. An Order that this action be maintained as a class action, appointing Plaintiffs as representatives of the Nationwide Class;

b. In the Alternative, an Order appointing Plaintiff xxxxxx as representative of the Illinois Class and Plaintiff HARDWICK as representative of the New York Class;

c. An Order appointing the undersigned attorney as Class Counsel in this action;

d. Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

e. All recoverable compensatory and other damages sustained by Plaintiffs and Class members;

f. Actual and/or statutory damages for injuries suffered by Plaintiffs and Class members in the maximum amount permitted by applicable law;

g. An order (i) requiring Defendant to immediately cease their wrongful conduct as set forth in this Complaint; (ii) requiring Defendant to engage in a corrective advertising campaign; and (iii) requiring Defendant to reimburse Plaintiffs and all Class members, up to the amounts paid for the Products;

h. Statutory pre-judgment and post-judgment interest on any amounts;

i. Payment of reasonable attorneys' fees and costs; and

j. Such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of themselves and all others similarly situated, demand a trial by jury on all questions of fact raised by the Complaint.

Dated: October 24, 2018

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: ____ */s/ C.K. Lee* _____

C.K. Lee, Esq. (#2903557)
73 West Monroe Street
Chicago, IL 60603
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

# Exhibit A

# Product #1 – CapriSun® Tropical Punch





**Ingredients:** FILTERED WATER; SUGAR; PEAR AND GRAPE JUICE CONCENTRATES; CITRIC ACID; ORANGE, APPLE, AND PINEAPPLE JUICE CONCENTRATES; NATURAL FLAVOR.

1

# Product #2 – CapriSun® Grape





**Ingredients:** FILTERED WATER, SUGAR, GRAPE AND PEAR JUICE CONCENTRATES, CITRIC ACID, NATURAL FLAVOR.

2

# Product #3 – CapriSun® Strawberry Kiwi





**Ingredients:** WATER, HIGH FRUCTOSE CORN SYRUP, APPLE AND STRAWBERRY JUICE CONCENTRATES, CITRIC ACID NATURAL FLAVOR, VITAMIN E ACETATE.

3

# Product #4 – CapriSun® Fruit Punch





**Ingredients:** FILTERED WATER; SUGAR; PEAR AND GRAPE JUICE CONCENTRATES; CITRIC ACID; ORANGE, APPLE, AND PINEAPPLE JUICE CONCENTRATES; NATURAL FLAVOR.

4

# Product #5 – CapriSun® Orange





**Ingredients:** FILTERED WATER, SUGAR, APPLE AND ORANGE JUICE CONCENTRATES, CITRIC ACID, NATURAL FLAVOR.

5

# Product #6 – CapriSun® Strawberry





**Ingredients:** FILTERED WATER, SUGAR, PEAR AND APPLE JUICE CONCENTRATES, CITRIC ACID, STRAWBERRY JUICE CONCENTRATE, NATURAL FLAVOR.

6

# Product #7 – CapriSun® Wild Cherry





**Ingredients:** FILTERED WATER, SUGAR, PEAR AND CHERRY JUICE CONCENTRATES, CITRIC ACID, GRAPE AND APPLE JUICE CONCENTRATES, NATURAL FLAVOR.

7

# Product #8 – CapriSun® Lemonade





**Ingredients:** FILTERED WATER, SUGAR, LEMON JUICE CONCENTRATE, CITRIC ACID, ROCHELLE SALT (NATURAL BUFFER), NATURAL FLAVOR.

8

# Product #9 – CapriSun® Red Berry





**Ingredients:** FILTERED WATER, SUGAR, PEAR JUICE CONCENTRATE, CITRIC ACID, STRAWBERRY JUICE CONCENTRATE, NATURAL FLAVOR.

9

# Product #10 – CapriSun® Surfer Cooler





**Ingredients:** FILTERED WATER; SUGAR; PEAR, ORANGE, AND PINEAPPLE JUICE CONCENTRATES; CITRIC ACID; NATURAL FLAVOR.

10

# Product #11 – CapriSun® Pacific Cooler





INGREDIENTS: FILTERED WATER; SUGAR; PEAR, GRAPE, AND ORANGE JUICE CONCENTRATES; CITRIC ACID; PINEAPPLE AND APPLE JUICE CONCENTRATES; NATURAL FLAVOR.

11



# Product #12 – CapriSun® Mountain Cooler





**Ingredients:** FILTERED WATER, SUGAR, APPLE JUICE CONCENTRATE, CITRIC ACID, NATURAL FLAVOR.

13

# Product #13 – CapriSun® Splash Cooler





**Ingredients**: FILTERED WATER, SUGAR, APPLE AND GRAPE JUICE CONCENTRATES, CITRIC ACID, STRAWBERRY JUICE CONCENTRATE, NATURAL FLAVOR.

14

# Product #14 – CapriSun® Coastal Cooler





**Ingredients**: FILTERED WATER, SUGAR, APPLE JUICE CONCENTRATE, CITRIC ACID, STRAWBERRY JUICE CONCENTRATE, NATURAL FLAVOR.

15

# Product #15 – CapriSun® Organic Fruit Punch





**Ingredients:** FILTERED WATER, ORGANIC APPLE JUICE CONCENTRATE, ORGANIC WHITE GRAPE JUICE CONCENTRATE, CITRIC ACID, ORGANIC ORANGE JUICE CONCENTRATE, NATURAL FLAVOR.

16

# Product #16 – CapriSun® Organic Apple





**Ingredients:** FILTERED WATER, ORGANIC APPLE JUICE CONCENTRATE, CITRIC ACID, NATURAL FLAVOR.

17

# Product #17 – CapriSun® Organic Strawberry Lemonade





**Ingredients:** FILTERED WATER, ORGANIC WHITE GRAPE JUICE CONCENTRATE, ORGANIC APPLE JUICE CONCENTRATE, ORGANIC LEMON JUICE CONCENTRATE, ORGANIC STRAWBERRY JUICE CONCENTRATE, CITRIC ACID, ROCHELLE SALT (NATURAL BUFFER), NATURAL FLAVOR.

# Product #18 – CapriSun® Organic Grape





**Ingredients:** FILTERED WATER, ORGANIC WHITE GRAPE JUICE CONCENTRATE, ORGANIC RED GRAPE JUICE CONCENTRATE, ORGANIC APPLE JUICE CONCENTRATE, CITRIC ACID, NATURAL FLAVOR.

19

# Product #19 – CapriSun® Organic Tropical Punch





**Ingredients:** FILTERED WATER, ORGANIC WHITE GRAPE JUICE CONCENTRATE, ORGANIC APPLE JUICE CONCENTRATE, ORGANIC ORANGE JUICE CONCENTRATE, ORGANIC PINEAPPLE JUICE CONCENTRATE, CITRIC ACID, NATURAL FLAVOR.

# Product #20 – CapriSun® 100% Juice: Apple





**Ingredients:** APPLE JUICE CONCENTRATE (WATER, APPLE JUICE CONCENTRATE), CITRIC ACID (FOR TARTNESS), NATURAL FLAVOR.

21

# Product #21 – CapriSun® 100% Juice: Berry





**Ingredients:** APPLE, GRAPE, AND STRAWBERRY JUICES FROM CONCENTRATE (WATER; APPLE, GRAPE, AND STRAWBERRY JUICE CONCENTRATES), CITRIC ACID (FOR TARTNESS), NATURAL FLAVOR.

22

# Product #22 – CapriSun® 100% Juice: Fruit Punch





**Ingredients:** APPLE, GRAPE, AND CHERRY JUICES FROM CONCENTRATE (WATER; APPLE, GRAPE, AND CHERRY JUICE CONCENTRATES), CITRIC ACID (FOR TARTNESS), NATURAL FLAVOR.

23

# Product #23 – CapriSun® 100% Juice: Grape





**Ingredients:** APPLE AND GRAPE JUICES FROM CONCENTRATE (WATER, APPLE AND GRAPE JUICE CONCENTRATES), CITRIC ACID (FOR TARTNESS), NATURAL FLAVOR.

24

# Product #24 – CapriSun® Fruit Refreshers: Awesomely Apple





**Ingredients:** FILTERED WATER, APPLE JUICE CONCENTRATE, CITRIC ACID, NATURAL FLAVOR.

25

# Product #25 – CapriSun® Fruit Refreshers: Very Berry Punch





**Ingredients:** FILTERED WATER, APPLE JUICE CONCENTRATE, WHITE GRAPE JUICE CONCENTRATE, CITRIC ACID, STRAWBERRY JUICE CONCENTRATE, NATURAL FLAVOR.

26

# Product #26 – CapriSun® Fruit Refreshers: Orange Pineapple Tango





**Ingredients:** FILTERED WATER, APPLE JUICE CONCENTRATE, WHITE GRAPE JUICE CONCENTRATE, CITRIC ACID, PINEAPPLE JUICE CONCENTRATE, ORANGE JUICE CONCENTRATE, NATURAL FLAVOR.

27

# Product #27 – CapriSun® Fruit and Veggie Blends: Apple Sweet Potato Smash





**Ingredients:** FILTERED WATER, WHITE GRAPE JUICE CONCENTRATE, APPLE JUICE CONCENTRATE, SWEET POTATO JUICE CONCENTRATE, CARROT JUICE CONCENTRATE, CITRIC ACID, PEAR JUICE CONCENTRATE, NATURAL FLAVOR.

28

# Product #28 – CapriSun® Fruit and Veggie Blends: Berry Carrot Blast





**Ingredients:** FILTERED WATER, WHITE GRAPE JUICE CONCENTRATE, APPLE JUICE CONCENTRATE, SWEET POTATO JUICE CONCENTRATE, CARROT JUICE CONCENTRATE, CITRIC ACID, STRAWBERRY JUICE CONCENTRATE, NATURAL FLAVOR.

# Product #29 – CapriSun® Fruit and Veggie Blends: Punch Carrot Craze





**Ingredients:** FILTERED WATER, WHITE GRAPE JUICE CONCENTRATE, APPLE JUICE CONCENTRATE, SWEET POTATO JUICE CONCENTRATE, CARROT JUICE CONCENTRATE, CITRIC ACID, CHERRY JUICE CONCENTRATE, NATURAL FLAVOR.

30

# Product #30 – CapriSun® Roarin' Waters: Tropical Fruit





**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

31

# Product #31 – CapriSun® Roarin' Waters: Berry





**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

32

# Product #32 – CapriSun® Roarin' Waters: Fruit Punch





**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

33

# Product #33 – CapriSun® Roarin' Waters: Grape





**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

34

# Product #34 – CapriSun® Roarin' Waters: Strawberry Kiwi





**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

35

# Product #35 – CapriSun® Roarin' Waters: Wild Cherry





**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

36

# Product #36 – CapriSun® Sport: Fruit Frenzy





**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, TRISODIUM CITRATE, TRIPOTASSIUM CITRATE, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

37

# Product #37 – CapriSun® Sport: Citrus Rush



**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, TRISODIUM CTIRATE, TRIPOTASSIUM CITRATE, STEVIA LEAF EXTRACT, NATURAL FLAVOR

# Product #8 – CapriSun® Sport: Grape Blast



**Ingredients:** FILTERED WATER, SUGAR, CITRIC ACID, TRISODIUM CITRATE, TRIPOTASSIUM CITRATE, STEVIA LEAF EXTRACT, NATURAL FLAVOR.

# Exhibit B

**Archived Content**

The content on this page is provided for reference purposes only. This content has not been altered or updated since it was archived.

Search Archive

Home Inspections, Compliance, Enforcement, and Criminal Investigations Compliance Actions and Activities Warning Letters

**Inspections, Compliance, Enforcement, and Criminal Investigations**

**Fresh Express Incorporated 10/6/10**

 Department of Health and Human Services

Public Health Service
Food and Drug Administration
San Francisco District
1431 Harbor Bay Parkway
Alameda. CA 94502-7070
Telephone: 510/337-6700

**WARNING LETTER**

**Via UPS**

October 6, 2010

Fernando Aguirre, President and CEO
Chiquita Brands International, Inc. and Fresh Express, Incorporated
250 East Fifth Street
Cincinnati, OR 45202

Dear Mr. Aguirre:

Starting on May 21, 2010 and ending on June 10, 2010, the Food and Drug Administration (FDA) inspected your food manufacturing facility located at 900 E. Blanco Road, Salinas, California. During this inspection, FDA investigators collected labels for your products and reviewed their labeling at http://www.chiquita.com[1]. Based on our review, we have concluded that your Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites" products are misbranded in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101). You can find the Act and FDA regulations through links at FDA's Internet home page at http://www.fda.gov[2].

Specifically, your "Pineapple Bites with Coconut" product is misbranded within the meaning of Section 403(a) of the Act [21 U.S.C. § 343(a)] in that its statement of identity, "Pineapple Bites with Coconut", is false and misleading. The ingredient statement for this product states that it is made with coconut; however, our investigation determined that this product is made with a coconut flavor spray. The characterizing flavor of your Pineapple with Coconut product must be identified in accordance with 21 CFR 101.22(i)(1)(iii) (for example. "coconut flavor").

Your "Pineapple Bites" and "Pineapple Bites with Coconut" products are misbranded within the meaning of Section 403(r)(1)(A) of the Act [21 U.S.C. § 343(r)(1)(A)] because their labeling bears nutrient content claims but the products do not meet the requirements for the claims.
Specifically, their labeling includes the claim "Plus ... Antioxidants." However, this claim does not include the names of the nutrients that are the subject of the claim or, alternatively, link the term "antioxidants" by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity. 21 CFR 101.54(g)(4). Your use of this antioxidant claim therefore misbrands your products under section 403(r)(2)(A)(i) of the Act [21 U.S.C. § 343(r)(2)(A)(i)].

Your "Pineapple Bites" and "Pineapple Bites with Coconut" products also bear the claim "Plus Phytonutrients." "Phytonutrients" are not nutrients for which a recommended daily intake (RDI) or daily recommended value (DRV) has been established. Therefore, nutrient content claims regarding "phytonutrients" are not authorized and further misbrand your products under section 403(r)(2)(A)(i) of the Act [21 U.S.C. § 343(r)(2)(A)(i)]. To the extent phytonutrients are intended to be the basis for an antioxidant nutrient content claim, that use would violate FDA regulations for the same reason and because phytonutrients are not recognized as having antioxidant activity. 21 CFR 101.54(g)(1) and (2).

Both your "Pineapple Bites" and "Pineapple Bites with Coconut" products also bear the statement "Only 40 Calories." This statement implies that the products are "low calorie" foods. A "low calorie" claim may be made if a food with a reference amount customarily consumed (RACC) greater than 30 grams (g) or greater than 2 tablespoons does not provide more than 40 calories per RACC. 21 CFR 101.60(b)(2)(i)(A). The RACC established for pineapple is 140 g. See 21 CFR 101.12(b) (Table 2, Fruits and Fruit Juices, All other fruits fresh, canned, or frozen).

The nutrition information for both products states that there are 40 calories per 1 piece (80 g) of product; this equals about 70 calories per RACC. Therefore, under 21 CFR 101.13(i)(2), the products are required to carry a disclaimer adjacent to the claim, e.g., "Only 40 calories per serving, not a low calorie food". Because your products fail to bear the required disclaimer, they are misbranded within the meaning of section 403(r)(1)(A) of the Act.

The "Pineapple Bites" and "Pineapple Bites with Coconut" products are further misbranded within the meaning of section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservatives ascorbic acid and citric acid but their labels fail to declare these preservatives with a description of their functions. 21 CFR 101.22. Further, the ingredients ascorbic acid and citric acid must be declared by their common or usual names. 21 CFR 101.4(a).

This letter is not intended to be an all-inclusive review of your firm's products and processes. It is your responsibility to ensure that your firm and your products comply with the Act and FDA, regulations. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory action without further notice. For instance, we may take further action to seize your products or enjoin your firm from operating.

We also note that, FDA (through its contractor) obtained two samples of Fresh Express Hearts of Romaine the testing of which yielded human pathogens. One sample was found to contain *Salmonella Anatum*; another sample was found to contain *E. coli 0157:H7*. We acknowledge that you issued letters to your customers in an effort to recall affected products. However, FDA recommends that you review your firm's criteria for receipt of raw product, your procedures for ensuring that wash, flume and processing water do not contaminate your products and any other conditions and practices that may relate to the cause of the contamination.

We further acknowledge your June 25, 2010 response to the Good Manufacturing Practices violations cited in the FDA Form 483 regarding this inspection. In your response, you committed to:

- Retrain employees to replace or sanitize their gloves after contacting unsanitized surfaces;

- Include the dryer hoist controls and the equipment control panels that involve direct employee contact in your daily wash and sanitation procedures;

- Create a new storage system for aprons, gloves, and sleeve guards for times during manufacturing when they are not in use; and

- Modify your cutting surface inspection and replacement program so that cutting surfaces will be changed after every **(b)(4)** of use.

However, you did not provide documentation to demonstrate that these corrections have been made. You also did not address the observation that your technician improperly read the free chlorine indicator tests in the flume water. Please provide this information and documentation in your response to this Warning Letter.

In addition to the labeling issues identified above, we note that the available labeling space is at least 6" in height; therefore, the size of the nutrition information declared on these packages is not appropriate and does not meet the formatting requirements under 21 CFR 101.9(d), including hairline and footnote requirements. We note that since some of the nutrients are at insignificant levels, a shortened version of the Nutrition Facts panel may be used, e.g., the statement "Not a significant source of dietary fiber", at the bottom of the table of nutrient values as allowed under 21 CFR 101.9(c).

Please notify this office in writing within fifteen (15) working days from the date you receive this letter of

the specific steps you have taken to correct the noted violations, including an explanation of how you plan to prevent these violations, or similar violations, from occurring again. Please include documentation of the corrective actions you have taken. If your planned corrections will occur over time, please include a timetable for implementation of those corrections. If corrective action cannot be completed within 15 working days, state the reason for the delay and the time within which the corrections will be completed.

Your response should be sent to:

> Darlene B. Almogela
> Director of Compliance
> United States Food and Drug Administration
> 1431 Harbor Bay Parkway
> Alameda, CA 94502

If you have any questions about the content of this letter please contact Sergio Chavez, Compliance Officer, at 510-337-6886.

/s/

Barbara Cassens
District Director

Page Last Updated: 10/08/2010
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

> Accessibility Contact FDA Careers FDA Basics FOIA No Fear Act Site Map Transparency Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

 

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

U.S. Department of Health & Human Services

Links on this page:

1. http://www.chiquita.com/
2. http://www.fda.gov

# Exhibit C

## Declaration of Dr. Marc Meyers

I, Dr. Marc Meyers, hereby state and declare as follows:

1.     I make this declaration pursuant to 28 U.S.C. § 1756.  Unless otherwise noted, the statements made herein are of my own first-hand knowledge and, if called upon to testify thereof, I could and would do so competently.

2.     I have been asked to evaluate the function of citric acid in the thirty eight (38) CapriSun beverage products listed in **Exhibit A** of the Complaint.

## Expert Qualifications

3.     I have been a food scientist for close to 30 years.  Food science is the study of food and food ingredient properties and their interactions to develop a safe way of preserving, processing, storing, distributing and packing food products.  Applications include all Food and Beverages such as baked goods, soft drinks, confectionery products, meats, dairy, formulated foods and other sweet, savory and beverage applications.  Food scientists working in the private sector generally work for food companies in research and development departments that create or modify the company's food products.

4.     I have a Doctor of Philosophy degree in Food Science/Food Packaging from Rutgers University (1987), a Masters in Philosophy degree in Food Science from Rutgers University (1985), a Masters of Science degree in Food Science/Food Packaging from Rutgers University (1984) and a Bachelors of Science degree in Food Science from Pennsylvania State University (1981).  I am also a Certified Food Scientist as accredited by the Institute of Food Technologists and the International Food Science Certification Commission (Certification #342).

5.      During my education, I focused on developing new testing methods for starch enzyme activity and flavor interactions in food packaging, and specifically studies of food additives and ingredients when stored in packaging at normal and accelerated aging.

6.      I have over 20 years of industrial experience in assisting food, pharmaceutical and dietary supplement companies in developing new technologies and products for their traditional food products, wellness ingredients and supplements.  I have worked for many multinational companies at the Vice President, Director or Senior Manager levels, including Wm. Wrigley Jr. Company, M&M/Mars, Inc., Duncan Hines brand (owned by Pinnacle), Natrol, Inc. (supplements), Dow Chemical (hydrocolloids), Rhodia (now Dannisco/DuPont) (texturants and hydrocolloids), Balchem Corp (encapsulation), and Firmenich, Inc. (flavor encapsulation technology).  I have initiated, improved or helped launch many products, such as Wrigley's edible film strips; M&M/Mars' heart-healthy aseptic cocoa drinks; Smart Balance/Earth Balance soy milk products; Natrol's Omega Solutions Cardio, Ostea, and Low Glycemic Carb Intercept; Pinnacle Foods' Duncan Hines Oven Ready Frozen Brownie Batter, and Pinnacle's Duncan Hines Whipped Frosting.

7.      Specifically, from 1987 to 1990, I worked for Dow Chemical Company in Midland, MI as Senior Development Chemist in Technical Service, developing food applications for METHOCEL food gums (hydrocolloids) and techniques for determining barrier properties of flour-based frying batters.

8.      Specifically, I worked in the field of hydrocolloids, at Dow Chemical Company in Midland, MI from 1987 to 1990, and at Rhodia from 1999-2000.  I also developed edilble films with hydrocolloids at Wm. Wrigley Jr. Company in Chicago, Illinois from 1990 to 1995. Hydrocolloids are substances that gel with water and help to provide stability and texture to foods,

2

which can be derived from both natural and synthetic sources. They are used in food as thickening agents, whipping agents, emulsifiers, coatings and stabilizers. At Dow, I was a Senior Development Chemist in Technical Service, responsible for developing food applications for METHOCEL food gums and techniques for determining barrier properties of flour-based frying batters. At Wrigley, I worked as Senior Exploratory Food Chemist, inventing new ingredients and ingredient systems (flavors, sweeteners, etc.) for chewing gum, and later as Senior Product Development Chemist, developing new chewing gum products that impart dental benefits to existing and new products.

9.      At Rhodia, I also coordinated and communicated efforts of research teams at various research and development ("R&D") centers in North America, Europe, Latin America, and Asia Pacific in developing food texture application projects for the top 20 international food companies. While still with Rhodia, I also served as the Director of Food Technology for North America from 1999 to 2000. In this position, I directed R&D for six food technology labs at two locations in the United States. I also managed 25 scientists and support staff with a $3.2 million R&D budget and held the administrative responsibility of hiring of Ph.D. level managers, advanced application scientists, and technical staff.

10.      I worked for Mars, Inc./Masterfoods USA (formerly M&M/Mars) from 2001 to 2003, in Vernon, California, where I held the position of New Technology Manger for Pet Care and Wellness ingredients. I focused on innovation and development of new pet food technologies to meet consumer insights for companion pets. My daily work required intimate knowledge of how consumers perceive products and understand the messages conveyed through product labeling and marketing.

3

11.     From 2003 to 2004, I gained director-level experience as Vice President for Technology and Product Development of Natrol, Inc., located in Chatsworth, California. I served a key technical advisor to the CEO, and was also a member of the Senior Executive Management Team that reported to the CEO. I was responsible for developing and executing R&D strategy for new product development, clinical research, and technical services for traditional formats of vitamins, minerals, and supplements.

12.     I held the position of Global Product Design Team Manager for Firmenich, Inc. from 2005 to 2006, in Princeton, New Jersey. In that position, I was the American group leader for a group of 5 scientists and flavorists functioning as the global flavor R&D design team that developed applications, new technology, and encapsulated flavor systems for sweet good products.

13.     I served as the Director of Product Development for Pinnacle Foods Corporation in Cherry Hill, New Jersey from 2006 to 2007. There, I was the group leader for the Duncan Hines® brand, Log Cabin®, and Mrs. Butterworth's® brand syrups. This job entailed developing new products and technical services for the most profitable brands within the organization and interfacing with the marketing department from concept development through commercialization, ensuring the timely and successful launch of products. I also coordinated development and innovation activities at co-packers and suppliers. As such, I have seen the interactions between company departments in launching a product many times over.

14.     From 2009 through 2016, I was an Adjunct Professor of Food Science and Nutrition at Montclair State University, teaching Food and Nutrition courses and labs. In addition, I taught a course at Rutgers University on Nutraceuticals and Functional Foods, and at Drexel University teaching Food Chemistry and a course on Functional Food Science. I have also been an adjunct

faculty member at Hunter College-CUNY in New York City and Mercer County College in New Jersey.

15.    Since 2008 I have been, and I currently am, the Managing Principal Research and Development Consultant of Meyers Consulting, LLC., of Richboro, Pennsylvania ("Meyers Consulting").    In this professional role, I have consulted with or have current consulting agreements with top multinational food, pharma, and dietary supplement companies, such as Johnson & Johnson/McNeil Nutritionals, ConAgra Foods, Kraft Foods Global, Smart Balance/Earth Balance (GFA Brands), DSM, Martek Biosciences, Senomyx, Microbia Precision Engineering, and other new technology and start-up biotech companies in the development and commercialization of new ingredients.    I routinely work with web-based organizations such as yourencore.com, ninesigma.com and innocentive.com as part of their Open Innovation communities to assist small domestic to major multi-national Consumer Packaged Goods ("CPG") companies.    My services include developing new technologies in the areas of encapsulation and hydrocolloid applications, and providing Open Innovation New Product Development ("NPD").    I also provide expert witness services in the areas of patent infringement, food, dietary supplements, and flavor industry.    From June, 2015 to February 2017, I also worked for Mondelez International while continuing to consult.    I was responsible for their global encapsulation R&D for food applications.

16.    Given the range of professional organization I have been involved with as a participant and a Board Member, I have been exposed to a variety of viewpoints throughout the industry and have maintained connections with industry leaders in chemistry generally as well as the narrow field of food science.    To start, I have been a member of the Institute of Food Technologists ("IFT") since 1978 and a Professional Member since 1988.    At the IFT, I served as

5

Secretary of the Chicago chapter from 1991 through 1994, Chair of the Chicago IFT Technical Programs from 1992 through 1993, Secretary of the New York IFT from 1998 through 2001 and Chair of the New York IFT Technical Program during Supplier's Night in 2010. The IFT is an international organization that is recognized for its membership of Food Scientists and had meetings and educational conferences where food ingredients are discussed.

17.    I was previously a member of the American Association of Cereal Chemists (AAC), Controlled Release Society (CRS) and American Association of Candy Technologists (AACT). These associations were specific to the food industry and provided opportunities for me to observe how many companies use the technology, ingredients and processes I have used in my career. Moreover, I have been a member of the American Chemical Society (ACS) and Advisory Board Member position at Bioactives World Forum Scientific allow me to remain abreast of the most recent developments in food chemistry and food safety, such as new ingredients and applications coming to the market and how they compare to current ingredients. Additionally, at Bioactives World, I am the co-organizer of an annual short-course on microencapsulation in flavors and bioactives as well as hydrocolloids, which covers many different uses of these technologies in food applications. (http://www.bioactivesworld.com/microencapsulation.html).

18.    I have authored numerous papers, articles and studies. For instance, I was first author on the following works: "Flavor Release and Application in Chewing Gum and Confections" in Microencapsulation in the Food Industry: A Practical Implementation Guide, Chapter 34, pp.443-453, Academic Press/Elsevier San Diego, CA (2014); "Functionality of Hydrocolloids in Batter Coating Systems" in Batter and Breadings in Food Processing 2nd Edition, Chapter 7, pp.117-138, American Association of Cereal Chemists, St. Paul, MN (2011); "Functionality of Hydrocolloids in Batter Coating Systems" in Batter and Breadings in Food

Processing, Chapter 7, pp.117-141, American Association of Cereal Chemists, St. Paul, MN (1990); Book Review of Gums and Stabilizers for the Food Industry 4 in Food Technology, 43(12):130-131 (1989); "Characterization of Radioactive Starch Degradation by Rhizopus Glucoamylase" in Journal of Food Biochemistry, 9(3):231-247 (1985). Thus, my work has been recognized in the industry since the 1980s. I am currently working on another chapter on Food Microencapsulation to be published in 2016.

19.     I also have presented papers at technical seminars. For example, in the area of encapsulation technology, I have presented at numerous society meetings including the Controlled Release Society (CRS), IFT, AACC, ACS and Food Ingredients Europe (FIE). I have also presented at an international conference on encapsulation of flavors for confectionery applications in Sion, Switzerland and at the Bioencapsulation Industrial Symposium in San Antonio, TX (http://impascience.eu/bioencapsulation/2011_San_Antonio/) as part of the European Bioencapsulation Group industrial workshop. I was invited to speak at these events based on the quality of my work and contributions to my field.

20.     Lastly, I have been awarded 36 patents (19 U.S. patents and 17 foreign patents) in encapsulation technology, edible films, flavor technology, hydrocolloids and novel confectionery applications. A select list of these patents and a more detailed account of my professional accomplishments and expertise are set forth in my current CV, a copy of which is attached to this report.

**Citric Acid and it's Function in CapriSun Beverage Products**

21.     Citric acid is an antioxidant, sequestrant, and preservative, among many other properties.[1,2] These include several mechanisms by which citric acid preserves food and beverages and change their taste.

22.     Citric acid is an acidity regulator, acidulant, and flavor enhancer used in food and food ingredients.

23.     Citric acid is a direct antimicrobial.

24.     Citric acid is often used for the effect it has in finished beverage products. Citric acid is also often used for its effects in finished food products.

25.     Some effects of citric acid, such as imparting changes to taste, only take place if there is a sufficient quantity of acid in the product. If the level of acid is too low, the acid will not change the taste or flavor of the product.

26.     Citric acid will act as preservatives even at levels lower than their taste thresholds. With a higher quantity of these acids, these effects will be more pronounced, but they still occur when low levels of acid are present. Such effects include: delaying spoilage from bacteria, mold, fungi, and yeast; delaying changes in color, flavor, texture; and delaying browning and rancidity.[3]

---

[1] The Food additives data book Lists citric acid as an acidulant with the following uses in food:
- Emulsifiers/Stabilisers/Chelating agents/Nutritive additives/**Antioxidants/pH control agents/Preservatives**/Flavour enhancers and modifiers/Solvents/Flour and baking additives/Anti-caking agents/Firming agents/ Glazing and coating agents.

- Citric acid is also listed separately as sequestrant. Smith, Jim, and Lily Hong-Shum. *Food additives data book*. John Wiley & Sons, 2011. pp. 14, 36, 60, 880, 898. https://cetiquimica2.files.wordpress.com

[2] "Acids as food additives serve a dual purpose, as acidulants and as preservatives." DeMan, John M. *Principles of food chemistry*. AVI Publishing Co., Inc., 1999, p. 438.

[3] Doores, S., 1993. Organic acids. In: Davidson, P.M., Branen, A.L. (Eds.), *Antimicrobials in Foods*. Marcel Dekker, Inc., New York, pp. 95–136. http://base.dnsgb.com.ua/files/book/Agriculture/Foods/Antimicrobials-in-Food.pdf

8

With a sufficient amount of citric acid, these effects can be prevented over the shelf-life of the food product.

27.     Among other mechanisms, citric acid preserves food by acting as antimicrobial agent.[4,5] This occurs in several ways.  One mechanism by which the acid kills microbes is by reducing the pH of products they are added to.  Microorganisms contaminating food generally multiply more slowly or not at all at lower pH levels (higher acidity).[6,7]

28.     Citric acid is a "weak acid," meaning that a substantial amount of the acid in any acidic solution does not dissociate (i.e., much of the citric acid does not act as an acid in a solution to further reduce pH).  To the extent that citric acid does not dissociate while in food or beverages, it is able to more easily penetrate the cell walls of microorganisms.  This weakens those organisms directly.[8,9,10] Beverages, particularly uncarbonated ones, need low pH to fight microorganisms.

29.     Citric acid is a sequestrant, meaning that it removes some elements and compounds from their environment.  The removal of these compounds slows degradation of food and

---

[4] Juvonen, Riikka, et al. Microbiological spoilage and safety risks in non-beer beverages. *VTT Research Notes 2599* (2011), p. 73.
http://www.vtt.fi/inf/pdf/tiedotteet/2011/T2599.pdf
[5] Lin, C. D., and T. C. Chen. Relative antifungal efficacies of phosphoric acid and other compounds on fungi isolated from poultry feed. *Animal feed science and technology* 54.1-4 (1995): 217-226.
[6] Doores, S., 1993. Organic acids. In: Davidson, P.M., Branen, A.L. (Eds.), *Antimicrobials in Foods*. Marcel Dekker, Inc., New York, pp. 95–136.
[7] Nazer, A. I., et al. Combinations of food antimicrobials at low levels to inhibit the growth of Salmonella sv. Typhimurium: a synergistic effect?. *Food Microbiology* 22.5 (2005): 391-398.
[8] Lambert, R. J., and M. Stratford. Weak-acid preservatives: modelling microbial inhibition and response. *Journal of applied microbiology* 86.1 (1999): 157-164.
http://onlinelibrary.wiley.com/doi/10.1046/j.1365-2672.1999.00646.x/epdf
[9] Querol, Amparo, and Graham H. Fleet. *Yeasts in food and beverages*. (2006), pp. 131-32.
[10] Spray, D. C., and M. V. L. Bennett. Physiology and pharmacology of gap junctions. *Annual review of physiology* 47.1 (1985): 281-303.

beverages. This acid sequesters metal ions (i.e., act as chelators),[11,12,13] effectively acting as an antioxidant. Sequestration prevents food deterioration chemical reactions and also retards microbial growth.[14]

    30.    Here is the list of thirty eight (38) Beverages from **Exhibit A** that I reviewed:

**Product #1** = CapriSun® "Tropical Punch"

**Product #2** = CapriSun® "Grape"

**Product #3** = CapriSun® "Strawberry Kiwi"

**Product #4** = CapriSun® "Fruit Punch"

**Product #5** = CapriSun® "Orange"

**Product #6** = CapriSun® "Strawberry"

**Product #7** = CapriSun® "Wild Cherry"

**Product #8** = CapriSun® "Lemonade"

**Product #9** = CapriSun® "Red Berry"

**Product #10** = CapriSun® "Surfer Cooler"

**Product #11** = CapriSun® "Pacifica Cooler"

**Product #12** = CapriSun® "Mountain Cooler"

**Product #13** = CapriSun® "Splash Cooler"

**Product #14** = CapriSun® "Coastal Cooler"

**Product #15** = CapriSun® "Organic Fruit Punch"

---

[11] *Id.*, p. 359.
[12] Downing, Donald L. A complete course in canning and related processes: processing procedures for canned food products. Elsevier, 2013, p. 450.
[13] MARTELL, ARTHUR E. "Chelates of ascorbic acid." 1982. 153-178.
[14] Igoe, Robert S. *Dictionary of food ingredients*. Springer Science & Business Media, 2001, p. 167.

**Product #16** = CapriSun® "Organic Apple"

**Product #17** = CapriSun® "Organic Strawberry Lemonade"

**Product #18** = CapriSun® "Organic Grape"

**Product #19** = CapriSun® "Organic Tropical Punch"

**Product #20** = CapriSun® "100% Juice: Apple"

**Product #21** = CapriSun® "100% Juice: Berry"

**Product #22** = CapriSun® "100% Juice: Fruit Punch"

**Product #23** = CapriSun® "100% Juice: Grape"

**Product #24** = CapriSun® "Fruit Refreshers: Awesomely Apple"

**Product #25** = CapriSun® "Fruit Refreshers: Very Berry Punch"

**Product #26** = CapriSun® "Fruit Refreshers: Orange Pineapple Tango"

**Product #27** = CapriSun® "Fruit and Veggie Blends: Apple Sweet Potato Smash"

**Product #28** = CapriSun® "Fruit and Veggie Blends: Berry Carrot Blast"

**Product #29** = CapriSun® "Fruit and Veggie Blends: Punch Carrot Craze"

**Product #30** = CapriSun® "Roarin' Waters: Tropical Fruit"

**Product #31** = CapriSun® "Roarin' Waters: Berry"

**Product #32** = CapriSun® "Roarin' Waters: Fruit Punch"

**Product #33** = CapriSun® "Roarin' Waters: Grape"

**Product #34** = CapriSun® "Roarin' Waters: Strawberry Kiwi"

**Product #35** = CapriSun® "Roarin' Waters: Wild Cherry"

**Product #36** = CapriSun® "Sport: Fruit Frenzy"

**Product #37** = CapriSun® "Sport: Citrus Rush"

**Product #38** = CapriSun® "Sport: Grape Blast"

11

31.     Of these thirty-eight (38) Capri Sun beverage products from **Exhibit** A of the Complaint all of them contain citric acid. Additionally, the "Sport" products (Product #36, 37 and 38) additionally contain derivatives of citric acids which are the sodium salt of citric acid (Trisodium Citrate); and the potassium salt of citric acid (Tripotassium Citrate). These breakdown (dissociate) in to citric acid in a liquid beverage such as these three Carpi Sun Sport beverages. Thus, these derivatives will function in the Products in the same way as the citric acid already therein functions, as detailed below.

32.     The citric acid will contribute to the flavor profile (tanginess)—but also contribute to controlling growth of microorganisms. Citric acid serves multiple purposes as an acidifier, a flavoring agent, and as an antioxidant. The citric acid's tang and fruitiness mimics the effect of citrus in fruit based sku's of the Capri Sun beverage products—but also, **the pH-lowering ability of citric acid make it function as an acidulant and therefore as preservatives.**

33.     **Citric acid in the Capri Sun beverage products infiltrates and weakens or kills organisms** within the Capri Sun beverage products listed above. The citric acid still provides all of these functions, regardless of whether it is mainly being used as a flavorant or for any other purpose—it still functions as a preservative by direct antimicrobial effect, lowers pH, and acts as a sequestrant and indirect antioxidant. Sequestration of metal ions by citric acid indirectly prevents oxidation of the Capri Sun beverage products and impedes microbial growth. In Summary:

a.  Citric acid functions as a preservative in the Capri Sun beverage products by serving as an acidulant, lowering their pH-level and thereby combatting microorganisms.
b.  Citric acid functions as a preservative in the Capri Sun beverage products by serving as an indirect antioxidant.
c.  Citric acid functions as a preservative in the Capri Sun beverage products by infiltrating and then weakening or killing microorganisms through direct antimicrobial effect. Regardless of whether this is the primary purpose for which it is added to the Capri Sun

beverage products, it still functions as a preservative by direct microbial effect, lowering pH levels, and acting as a sequestrant and indirect antioxidant.

d. Citric acid functions as a preservative in the Capri Sun beverage products through sequestration, which prevents oxidation and impedes microbial growth.

e. Citric acid serves these functions regardless of whether it is also being used as a flavorant.

f. The fact that Defendant may also employ other means of preserving the CapriSun beverage products, like a hermetic seal, does not change citric acid's function as a preservative.

## Multi-Barrier "Hurdle" Systems of Food Preservation

a.      Food scientists consider the cumulative effect of all risks to the integrity of food. The best practice when designing production systems is to impose many "hurdles" to degradation.[15,16] For example, a food manufacturing process might simultaneously use a safeguard against contamination by microbial spores (such as using a hermetic seal) as well as a mechanism to reduce the fecundity of any spores already within the food (such as using an acid to reduce pH). When more than one method or ingredient has a preservative effect, each is a "preservative" because it acts as an obstacle to food degradation.[17,18]

---

[15] Leistner, L. Hurdle technology applied to meat products of the shelf stable product and intermediate moisture food types. *Properties of water in foods*. Springer Netherlands, 1985. 309-329.

[16] Leistner, Lothar. Basic aspects of food preservation by hurdle technology. *International journal of food microbiology* 55.1 (2000): 181-186.

[17] Bae, Y-M., and S-Y. Lee. "Combined effects of organic acids and salt depending on type of acids and pathogens in laboratory media and acidified pickle*." Journal of applied microbiology* 119.2 (2015): 455-464, p. 455-56.

[18] Biesta-Peters, Elisabeth G., et al. Comparing nonsynergistic gamma models with interaction models to predict growth of emetic Bacillus cereus when using combinations of pH and individual undissociated acids as growth-limiting factors. *Applied and environmental microbiology* 76.17 (2010): 5791-5801.
https://www.researchgate.net/profile/Marcel_Zwietering/publication/45271734_Comparing_Non synergistic_Gamma_Models_with_Interaction_Models_To_Predict_Growth_of_Emetic_Bacillu s_cereus_when_Using_Combinations_of_pH_and_Individual_Undissociated_Acids_as_Growth-Limiting_Factors/links/02e7e51e3d02ef2a1f000000/Comparing-Nonsynergistic-Gamma-Models-with-Interaction-Models-To-Predict-Growth-of-Emetic-Bacillus-cereus-when-Using-Combinations-of-pH-and-Individual-Undissociated-Acids-as-Growth-Limiting-Factors.pdf

13

b.     In the case of the Capri Sun beverage products, citric acid must be considered preservatives under food design standards even if flavor was a consideration when they were included because they have the effect of protecting the products from spoilage and staleness, and the potential hurdles attendant to the use of those ingredients is always a consideration in food design and manufacturing. Likewise, the acid must be considered a preservative against microorganisms even if the seal on the products is designed to keep out microorganisms or if other factors also work to retard spoilage.

**Conclusion**

c.     In summary, it is clear that citric acid acts as preservatives in the thirty eight (38) referenced Capri Sun beverage products and act as pH-reducers, antioxidants, and antimicrobial agents beyond just being used for tanginess and flavor effects.

d.     Additional reference information I reviewed to support this conclusion can be found in the following online sources:

http://legalnewsline.com/stories/511063295-nestle-usa-to-vigorously-defend-itself-against-baseless-deceptive-marketing-allegations

- According to the FDA website, citric acid is listed in the category of preservatives used to "prevent food spoilage from bacteria, molds, fungi or yeast" and slows and "prevents changes in color, flavor, or texture".

http://onlinelibrary.wiley.com/doi/10.1111/j.1541-4337.2006.00009.x/full

14

- There are several mechanisms by which citric acid preserves food and beverages, some of which apply to almost any. Most food and beverages are acidic, and one way that citric acid preserves food is by making them more acidic. Even if a food is alkaline (i.e., has a pH above 7.0, which denotes very low acidity), citric acid may still act as a preservative and can still affect the delay of browning and rancidity, even in lower or trace amounts.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on September 29, 2018 in Richboro, PA.

Dr. Marc A. Meyers

15