UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

KATRINA TARZIAN and SENIA HARDWICK,
*on behalf of themselves and others similarly situated*,

    Plaintiff,

v.

KRAFT HEINZ FOODS COMPANY,

    Defendant.

Case No.: 1:18-cv-07148

Judge Charles P. Kocoras

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

This is a consumer protection action seeking redress for, and a stop to, Defendant's unfair and deceptive practice of advertising and marketing its Capri Sun® beverages ("the Products") as containing no artificial preservatives. Defendant's representations to this effect are deceptive because the Products in fact contain the preservative citric acid. This labeling deceives consumers into believing that they are receiving healthier, artificial preservative-free beverages even though Defendant's products cannot live up to these claims.

Defendant asks the Court to strike and dismiss Plaintiffs' Amended Class Action Complaint ("Amended Complaint" or "Am. Compl."). While Defendant's Memorandum ("Def. Mem.") forwards a bevy of meritless arguments, Plaintiffs' allegations are more than sufficient to sustain this class action. Plaintiffs need only assert factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiffs' claim to relief must be "plausible on its face," *Id*. at 570, and a complaint fails if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). However, "[t]he plausibility standard [on a motion to dismiss] is not akin to a probability requirement." *Id*. at 1937. Plaintiffs need only "nudge" his allegations "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 548. The Amended Complaint satisfies these standards because it clearly alleges that the Products contain artificial preservatives—artificial citric acid—and supports this with evidence that all citric acid used in modern industrial food production is artificial.

## ARGUMENT

### I. PLAINTIFFS HAVE PLED FACTS TO SUPPORT AN ACTIONABLE MISREPRESENTATION

Defendant begins its argument that Plaintiffs fail to plead an actionable misrepresentation with the claim that "Plaintiffs make no attempt to even define "artificial preservatives."" Def. Mem., pg. 7. But this contention is straightforwardly refuted by Amended Complaint ¶ 40:

> While citric acid was directly extracted from lemons and other fruits in the 19th Century, this does not describe the production of citric acid today. Today, it is manufactured industrially, usually through the process of fermentation, which is defined as "[a]ny of a group of chemical reactions induced by microorganisms or enzymes that split complex organic compounds into relatively simple substances."[1] Thus, citric acid is an artificial, chemical preservative, not a natural one.

Plaintiffs' definition of "artificial preservatives" is therefore plain. Non-artificial citric acid is citric acid extracted directly from lemons and other fruits. Artificial citric acid is citric acid that is manufactured industrially, usually through industrial fermentation.

Defendant also argues that this proves nothing about the citric acid actually contained in the Products. See Def. Mem., pg. 7. But the Amended Complaint reproduces the testimony of

---

[1] http://www.thefreedictionary.com/fermentation

myriad journalists and experts the upshot of which is that extracting non-artificial citric acid directly from fruits is economically prohibitive in the context of industrial food production (like that of the Products) and that citric acid today is therefore obtained through industrial fermentation. These allegations and their support might not sustain Plaintiffs' claims on a motion for summary judgment, but they are more than enough to survive a motion to dismiss, more than enough to "nudge" their allegations "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 548.

Since discovery has not yet taken place, Plaintiffs do not yet have access to the specific documents that will prove that Defendant or its suppliers produce the citric acid in the Products though industrial fermentation or some other artificial means. But "[t]he *Twombly* plausibility standard, which applies to all civil actions… does not prevent a plaintiff from 'pleading facts alleged upon information and belief' where the facts are peculiarly with the possession and control of defendant." *Arista Records Ltd. Liab. Co. v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010).

Next, Defendant contends that Plaintiffs have failed to allege that the fermentation process through which citric acid is typically manufactured today are artificial as opposed to natural. Defendant argues: "In fact, the U.S. Food & Drug Administration ('FDA') has recognized that citric acid is, by definition, 'a naturally occurring constituent of plant and animal tissues,' *including* when it is obtained 'by mycological fermentation' or 'from Aspergillus niger fermentation,' 21 C.F.R. § 184.1033(a) (emphasis added), the same process to which Plaintiffs refer." Def. Mem., pgs. 7-8. However, the "by definition" and "including" in the foregoing argument are fabrications of Defendant, as is readily revealed by the full text of 21 C.F.R. § 184.1033(a):

> Citric acid ($C_6H_8O_7$, CAS Reg. No. 77-92-9) is the compound 2-hydroxy-1,2,3-propanetricarboxylic acid. It is a naturally occurring constituent of plant and animal tissues. It occurs as colorless crystals or a white powder and may be anhydrous or contain one mole of water per mole of citric acid. Citric acid may be produced by recovery from sources such as lemon or pineapple juice; by mycological fermentation using Candida spp.,

3

>described in §§ 173.160 and 173.165 of this chapter; and by the solvent extraction process described in § 173.280 of this chapter for the recovery of citric acid from Aspergillus niger fermentation liquor.

Plaintiffs' allegations do not require them to deny that citric acid "is a naturally occurring constituent of plant and animal tissues." On the contrary, so much is expressly acknowledged in Am. Compl. ¶ 40, quoted above, where Plaintiffs note that citric acid can be extracted directly from lemons and other fruits. However, it does not follow that citric acid is "by definition" natural in this sense. Indeed, this interpretation is plainly foreclosed by 21 C.F.R. § 184.1033(a) itself, which goes on to list other varieties of citric acid that are not "naturally occurring." Defendant's use of "including" is intended to suggest that citric acid recovered through industrial fermentation is somehow encompassed by the FDA's definition of "naturally occurring." But this is both logically and semantically implausible, since mycological fermentation and Aspergillus niger fermentation are *not* "naturally occurring." The FDA did *not* write that citric acid is a "naturally occurring product of mycological fermentation and Aspergillus niger fermentation," and Defendant's attempt to read this into the text strains credulity. The wording of 21 C.F.R. § 184.1033(a) *argues for* Plaintiffs' definition of "artificial," not against it.

Defendant also cites quotes 7 C.F.R. § 205.605(a) in support its argument that "citric acid 'produced by microbial fermentation of carbohydrate substances' is by definition a 'nonsynthetic' ingredient that may be labeled as 'organic.'" Def. Mem., pg. 8. However, the distinction between the synthetic and the nonsynthetic is a technical scientific one having nothing to do with how reasonable consumers distinguish between the "artificial" and the "natural" or non-artificial. The website *sciencing.com* explains the nature of chemical synthesis:

>Synthesis is one of the four main types of chemical reactions, and it occurs when two or more substances -- either elements or compounds -- combine to yield a new compound. That means the reaction involves more than one reactant and generally just one product

4

that contains each element from the reactants. Many significant chemical reactions are synthesis reactions.[2]

Chemically speaking, such synthesis can be contrasted with the definition of fermentation, here provided by fermentation equipment manufacturer Klever Equipped, Inc.

> Fermentation is the process of converting carbohydrates to alcohol or to organic acids using microorganisms, such as yeasts or bacteria. This process takes place when there are beneficial bacteria present that break down the starch and sugars in the food.[3]

Thus, the difference between synthesis and fermentation is that whereas the former combines molecules, the latter breaks down molecules. However, this technical distinction does not in any way correspond to how reasonable consumers differentiate between the artificial and the natural or non-artificial. Synthesis can occur artificially, through industrial manufacturing, but it also occurs naturally without human involvement with the corrosion and rusting of metal. As *sciencing.com* explains: "One important synthesis reaction that occurs in nature is that of a metal and an oxygen molecule to form a metal oxide. This reaction is also an oxidation reaction and is the first step in the corrosion of a metal. Since oxygen is a natural component of air, it reacts with the top surface of metals to form a new layer of metal oxide." This process is "synthetic" in the technical sense employed by chemists, but reasonable consumers would not for this reason describe it as "artificial."

Likewise with fermentation. Fermentation occurs in nature and can be initiated through traditional methods which reasonable consumers might consider natural or non-artificial, "such as those for making bread, cheese, yogurt, vinegar, beer, and wine [that have] been used by people for thousands of years before its microbial nature was understood."[4] But fermentation can also proceed

---

[2] https://sciencing.com/examples-chemical-synthesis-15633.html
[3] http://goklever.com/fermentation-role-food-processing/
[4] Markov, Sergei. (2012). Industrial fermentation, pg. 1037;
https://www.researchgate.net/publication/281716235_Industrial_fermentation

artificially and non-naturally. Russian biochemist Chaim Weizmann, the father of industrial fermentation, used fermentation to derive acetone from starch, which was then used to make explosives in World War I[5] – hardly a "natural" phenomenon. Researcher Sergei Marcov observes that "[n]umerous chemicals, such as amino acids, polymers, organic acids (citric, acetic, and lactic), and bioinsecticides are produced by industrial fermentation."[6] These chemicals also include biofuels.[7] Industrial fermentation "requires knowledge from disciplines such as microbiology, biochemistry, genetics, chemistry, chemical and bioprocess engineering, mathematics, and computer science,"[8] which is hardly the mark of a "natural" or non-artificial process.

These points are illustrated by the following description of one industrial fermentation process from *sciencedirect.com*:

> **2.3. Microbial cultures and inoculum development**
> In the present study, both of the microbial strains i.e., *Aspergillus* ornatus and *Alternaria alternata* were obtained from the Department of Biochemistry and Molecular Biology, University of Gujrat, Pakistan, grown on Vogel's agar slants at 35 °C for 3 days and stored at 4 °C for the whole experiment. To develop a homogeneous inoculum suspension, a pure colony of each strain was transferred into 100 mL of Vogel's liquid medium supplemented with trace elements after sterilizing the liquid medium at 103 kPa and 121 °C for 15 min. The g/L ingredients of the trace element solution were: $ZnSO_4.7H_2O$, 1.0; $CuSO_4.5H_2O$, 0.50; $MnSO_4.H_2O$, 0.50 and $Na_2MoO_4.2H_2O$, 0.50. The inoculated culture was then incubated in a temperature-controlled shaking incubator at 30 °C for 20 h at 140 rpm for the development of a homogenous inoculum.
>
> **2.4. Fermentation protocol**
> During the initial substrate screening trial, 20 g of each of the aforementioned substrates was taken in a 500 mL Erlenmeyer flask, moistened with Vogel's media, and inoculated with the freshly developed fungal spore suspension of *A. ornatus*, *A. alternata* and a co-culture consortia. All of the inoculated experimental flasks were incubated at 30 ± 1 °C for 5 days. After the stipulated fermentation time (24 h), 100 mL of distilled water was added to the fermented cultures and was then incubated in a temperature-controlled shaking incubator at 30 °C for half an hour at 180 rpm. The homogenized media were then

---

[5] *Id*. at 1038.
[6] *Id*. at 1040.
[7] *Id*. at 1041.
[8] *Id*. at 1037.

> centrifuged at 10,000× g for 10 min at 4 °C to get clear supernatant containing product solution; the resultant clear supernatant was used for analytical studies.
>
> **2.5. Determination of biomass**
> The pellets obtained during the extraction process were re-suspended in 50 mM phosphate buffer at pH 7.0 and re-centrifuged at 10,000 × g for 10 min in pre-weighed falcon tubes and dried at 80 °C until reaching constant weight and final biomass weights in grams were recorded.[9]

The "pellets obtained during the extraction process" are "nonsynthetic" in the technical sense that they were created by breaking down molecules rather than by combining them. Nevertheless, a reasonable consumer learning of the above process would likely consider these pellets "artificial" and see a difference between them and the wine, cheese, and yogurt that denizens of the planet have been fermenting traditionally for thousands of years. The same holds true of Defendant's industrial manufacturing processes, which is why Defendant's motion must be denied.

The same point is illustrated by the following image of a pharmaceutical technician attending to a row of fermentation units or "bioreactors"[10]:



---

[9] https://www.sciencedirect.com/science/article/pii/S1687850715001004
[10] https://www.researchgate.net/publication/281716235_Industrial_fermentation

7

Again, what transpires in these vats is "nonsynthetic" in the technical scientific sense. Molecules are being broken down, not combined. Nevertheless, a reasonable consumer would likely deem this "artificial."

Defendant next draws the Court's attention to *Osborne v. Kraft Foods Grp., Inc.*, No. 3:15-cv-02653 (N.D. Cal.), which it argues undermines Plaintiffs' case. Close inspection reveals otherwise. In the first place, *Osborne* cannot shed much light on the instant action given that the plaintiff at oral argument argued that "the majority of citric acid is unnatural; it's derived from a corn-based ingredient, which is grown from GMOs." ECF Doc. No. 31, 6: 3-6. By contrast, Plaintiffs' allegations in the instant action do not turn on whether the ingredients from which Defendant's citric acid is derived have been genetically modified. Second, the *Osborne* court expressly repudiated the suggestion that nonsynthetic ingredients which may be permissible in organic products are by definition "natural" (and hence non-artificial): "[T]o say that by definition because it's allowed in an organic product it must be natural is just not correct, and I've rejected that argument before." *Id*. at 9:8-10.

Most significantly, Defendant conveniently omits to mention that the *Osborne* complaint was dismissed *with leave to amend*, *see* ECF No. 28, precisely because plaintiff Osborne persuaded the court that he could amend his complaint to include factual allegations that are already present in Plaintiffs' Amended Complaint:

> **THE COURT:** But wait a minute. You just said we have nothing that states – we have nothing here that states that the citric acid is naturally derived. You're putting the burden on them. I mean, you have a pleading burden at the complaint stage. You can't just file a lawsuit without having actual reason to believe that the ingredient is not all natural and then say I need to do discovery to see if my guess is correct.

*Id*. at 5: 13-20.

> I have a complaint in front of me that complains a lot about citric acid generally and asserts generally that citric acid is not natural. It doesn't say anything about – it doesn't distinguish

8

between different kinds of citric acid, and it doesn't say anything about what kind of citric acid Kraft uses.

*Id.* at 6:23 – 7:3.

>    **MR. LOPATIN:** No. Actually, Your Honor, we did. And I've been doing these cases for years, and the majority of citric acid is unnatural, and I can cite to you specific scientific articles relating to that, and those are things I relied on. And possibly I didn't –
>
>    **THE COURT:** But you didn't cite – you didn't say any of that in your complaint.

*Id.* at 12: 8-14.

The contrast with the instant action is obvious. Plaintiffs here *do not* "complain[] a lot about citric acid generally and assert[] generally that citric acid is not natural." To the contrary, they acknowledge that citric acid *can* theoretically be natural and that it *was* mostly natural until about a century ago with the rise of industrial citric acid fermentation. Plaintiffs therefore *do* "distinguish between different kinds of citric acid" and allege that the artificial kind was used in the Products. Unlike plaintiff Osborne, they also provide factual support for the claim that "the majority of citric acid is not natural," including the testimony of "Mary Mulry, Ph.D., a food scientist and founder of consulting firm FoodWise." *See* Am. Compl. ¶ 41. In short, all the defects which Osborne persuaded the court could be cured through a future amended complaint *are not present* in the instant action. *Osborne* also belies Defendant's suggestion that 21 C.F.R. § 184.1033(a) and 7 C.F.R. § 205.605(a) somehow bar Plaintiffs' claims, since this would have been a reason to dismiss the Osborne complaint with prejudice rather than with leave to amend. If citric acid and nonsynthetics are "by definition" natural, then no amended complaint could have conceivably cured this.

Thus, the one case Defendant cites that might *seem* on point really is not and in fact redounds to Plaintiffs' cause once read closely. In addition, there are myriad other cases where challenges like Defendant's have been rejected as raising factual questions not appropriately

9

adjudicated on a motion to dismiss. In *Jones v. Conagra Foods, Inc.*, defendant faced a class action for labeling products with alleged chemicals such as citric acid and calcium chloride as "natural." In its motion to dismiss, the defendant presented evidence that citric acid can be either natural or non-natural. However, the possibility that some citric acid is natural was insufficient to carry a motion to dismiss because facts are considered in the light most favorable to a non-moving party on a motion to dismiss: "Without further evidence that Defendant's products included the permissible citric acid, it would be improper to dismiss Plaintiffs' claims on this matter." *Jones v. Conagra Foods, Inc.*, 912 F. Supp. 2d 889, 900-1 (N.D. Cal. 2012). *See also Ivie v. Kraft Foods Glob., Inc.*, No. C-12-02554, 2013 U.S. Dist. LEXIS 25615, at *29 (N.D. Cal. Feb. 25, 2013) ("the factual determinations of whether maltodextrin is used as a sweetener and/or sodium citrate is used as a flavoring agent in this particular product, and whether a reasonable consumer would have thus been misled by the 'no artificial sweeteners or preservatives' label, are inappropriate for determination on a motion to dismiss."); *Leonhart v. Nature's Path Foods, Inc.*, No. 13-cv-00492-BLF, 2014 U.S. Dist. LEXIS 164425, at *19 (N.D. Cal. Nov. 21, 2014) ("Defendant's argument that tocopherol is not actually a chemical preservative presents a factual issue not appropriate for determination at the pleading stage.").

Defendant does not challenge Plaintiffs' allegations, supported by an expert report, that the citric acid in the Products functions as a preservative, and merely denies that it is an artificial preservatives. But courts have also rejected such challenges is inappropriate on a motion to dismiss, and this illustrates the broader principle that factual questions about the function and/or origins of alleged preservatives do not warrant dismissal of a complaint.

In *Thomas v. Costco Wholesale Corp.*, defendant argued that "the product contains natural tocopherols, which Plaintiffs cannot allege function as preservatives." Unpersuaded, the court

10

held that plaintiff's claims were "properly pled, may deceive a reasonable consumer, and are inappropriate to resolve at the motion to dismiss stage." *Thomas v. Costco Wholesale Corp.*, No. 5:12-CV-02908, 2014 U.S. Dist. LEXIS 46405, at *28 (N.D. Cal. Mar. 31, 2014). Likewise, in *Engurasoff v. Coca-Cola Co.*, 13-03990, 2014 U.S. Dist. LEXIS 116936, at *12 (N.D. Cal. Aug. 21, 2014), defendants argued "that chemical preservatives only include ingredients that are specifically added to food for their preservative function, and that, phosphoric acid does not meet this definition for Coke." Unpersuaded, the court held that "even if Defendants' interpretation of the FDA regulations was accurate, it would require a factual determination that is not appropriate at this procedural stage." In *Silva v. Smucker Nat. Foods, Inc.*, defendant Smucker "dispute[d] that Natural Brew contains phosphoric acid 'in concentrations sufficient to do anything but impact flavor [and/or] acidify the product.'" Yet the court held that "this is a question of fact that cannot be decided as a matter of law at this stage of the case." *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154, 2015 U.S. Dist. LEXIS 122186, at *18-19 (E.D.N.Y. Sep. 14, 2015). *See also Gitson v. Trader Joe's Co.*, No. 13-cv-01333, 2014 U.S. Dist. LEXIS 33936, at *13-14 (N.D. Cal. Mar. 14, 2014) ("Trader Joe's provides no support for its contention that citric acid and sodium citrate do not fall under 21 C.F.R. § 101.22(a)(5)'s definition. At the pleading stage I cannot second guess the truth of the plaintiffs' allegations that the identified ingredients function as artificial flavors or chemical preservatives.").

## II. PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF

Defendant argues that Plaintiffs lack standing to pursue injunctive relief because they will not be deceived by the Products again and so will not suffer future injury. Def. Mem., pgs. 10-11. However, this argument ignores that "an injunction in connection with a class action is designed to afford protection of future consumers from the same fraud. It does this by permitting the plaintiff

11

to sue on their behalf." *Belfiore v. Procter & Gamble Co.*, F. Supp. 3d 440, 445 (E.D.N.Y. 2014). To hold otherwise "denigrate[s] the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated." *Id*. *See Delgado v. Ocwen Loan Servicing Company, LLC*, 2014 U.S. Dist. LEXIS 135758, 2014 WL 4773991, at *42 (E.D.N.Y. Sept. 23, 2014) ("Finding that Plaintiffs have no federal standing to enjoin a deceptive practice once they become aware of the scheme would eviscerate the intent of the California legislature in creating consumer protection statutes.") (internal quotation marks and citation omitted); *Ackerman v. Coca-Cola Co*., 2013 U.S. Dist. LEXIS 184232, 2013 WL 7044866, at *56 n.23 (E.D.N.Y. July 17, 2013) ("[C]ourts have consistently held that plaintiffs have standing to seek injunctive relief based on the allegation that a product's labeling or marketing is misleading to a reasonable consumer. To hold otherwise would 'effectively bar any consumer who avoids the offending product from seeking injunctive relief.'") (quoting *Koehler v. Litehouse, Inc.*, 2012 U.S. Dist. LEXIS 176971, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012)).

Some have argued that the policy considerations behind state consumer protection laws must yield to the Constitution. But there is no conflict between the two. The Supreme Court has held that "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). This formulation thus presupposes that the proper party *exists*: The reference is to *the* proper party, whomever that happens to be, not to *a* proper party, who might or might not exist. And this is consistent with the reasoning of courts that have held injunctive relief to be appropriate in consumer fraud class actions: Given the specific conundrum intrinsic to these cases—that anyone who becomes aware of the deception and so is positioned to bring a complaint is unlikely to be duped again—the usual application of the standing rule must be adjusted accordingly if there is ever to be a proper party, which the *Raines* formulation

12

indicates there must be. *See Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 533-34 (N.D. Cal. 2012) ("As plaintiffs further note, were the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result."); *Henderson v. Gruma Corp.*, 2011 U.S. Dist. LEXIS 41077, 2011 WL 1362188 at *7 (C.D. Cal. Apr. 11, 2011) ("If the Court were to construe Article III standing for FAL and UCL claims as narrowly as the Defendant advocates, federal courts would be precluded from enjoining false advertising under California consumer protection laws because a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter ('once bitten, twice shy') and would never have Article III standing."); *Fortyune v. American Multi-Cinema, Inc.*, 2002 U.S. Dist. LEXIS 27960, 2002 WL 32985838, *7 (C.D. Cal. Oct. 22, 2002) ("If this Court rules otherwise [and does not find standing], like defendants would always be able to avoid enforcement of the ADA. This court is reluctant to embrace a rule of standing that would allow an alleged wrongdoer to evade the court's jurisdiction so long as he does not injure the same person twice.").

In the consumer fraud context, the proper party to request injunctive relief is the party that already has standing to request other forms of relief arising out of the same case or controversy. This is the *best conceivable* party given the very nature of the cause of action and the public interest. Article III does not require more than this. The alternative is a state of affairs in which those who need and are entitled to injunctive relief are epistemologically unable to act on that right while those who have the knowledge to do so are for this very reason legally disqualified from doing so.

### III. ICFA REACHES BOTH PLAINTIFFS' CLAIMS

Defendant argues that the ICFA does not reach the claims of non-Illinois Plaintiff Hardwick. However, Illinois law in fact allows for greater flexibility than Defendant

13

acknowledges, placing her cause of action within the reach of the ICFA. *See Avery v. State Farm Mutual Auto. Ins. Co.*, 835 N.E.2d 801, 853 (2005) ("The place of injury or deception is only one of the circumstances that make up a fraudulent transaction and focusing solely on that fact can create questionable results. If, for example, the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only thing that occurs out-of-state is the injury or deception, it seems to make little sense to say that the fraudulent transaction has occurred outside Illinois.").

Defendant cites *Haught v. Motorola Mobility, Inc.*, No. 12 C 2515, 2012 WL 3643831, at *3 (N.D. Ill. Aug. 23, 2012) (citing *Avery*) for nine relevant factors for determining the reach of the ICFA. *See* Def. Mem., pg. 12. Some of these factors militate against the ICFA reaching Plaintiff Hardwick, like the fact that she resides in New York and purchased the Product in New York. But many others accrue to the ICFA reaching her claims. Defendant stresses that its headquarters in Illinois standing alone does not sustain the ICFA's reach beyond Illinois. But Illinois is also where the deceptive claims were made. They were read in New York but made in Illinois. This is not a situation where the misrepresentation first emanated from one of Defendant's agents operating outside of Illinois. Further, the profits ensuing from this misrepresentation flowed back to Illinois, as have any consumer complaints regarding the Products. Thus, Plaintiff Hardwick's claims are sufficiently tied to Illinois to sustain the reach of the ICFA.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion should be denied in its entirety

Dated: April 4, 2019

                        Respectfully submitted,

                        By:    */s/ C.K. Lee*
                               C.K. Lee, Esq.

                        **LEE LITIGATION GROUP, PLLC**
                        C.K. Lee, Esq. (#2903557)
                        73 West Monroe Street
                        Chicago, IL 60603
                        Tel.: 212-465-1188
                        Fax: 212-465-1181
                        Email: cklee@leelitigation.com
                        *Attorneys for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2019, true and correct copies of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint were served on all counsel of record via ECF.

*/s/ C.K. Lee*
C.K. Lee, Esq.